May it please the Court, my name is Jason Jarvis, and I'm the appointed pro bono counsel for Petitioner Ripza Keshishian. I plan to reserve two minutes of my time for rebuttal. There's two points that I'd like to stress today, Your Honors. First is that the immigration judge's adverse credibility finding is not supported by substantial evidence. Second, Ms. Keshishian is entitled to asylum eligibility because she was persecuted in the past and will be if she's returned to Iran. Now, as to the ---- KENSHISHAN The second claim hinders on the first, right? If we don't believe her or if we uphold her credibility determination, then there's nothing left. GONZALES Your Honor, I don't precisely agree with that because although it by and large requires her testimony, the immigration judge below found that she was, A, very fearful of being returned to Iran, and, B, under the Iranian country report, that she would be subject to persecution if she was returned. And that's – that underlies  KENSHISHAN So it's your position that even if we uphold I.J.'s credibility finding and determine that everything your client said was – can be taken as untrue, she nevertheless entitled to asylum under the remaining evidence. I just want to understand your position. GONZALES That is our position, Your Honor. However, I think that it's clear from the immigration judge's adverse credibility finding that it's simply not supported by substantial evidence. Now, that is a deferential standard, certainly. However, this Court is – RENAN I think you said highly deferential. GONZALES Well, this Court has described it as both deferential or highly deferential, depending on which case. But it's – although it is deferential to some extent, this Court has required immigration judges to do certain things to get that deference. For example, it has required immigration judges to rely on material inconsistencies or nonresponsiveness, those that go to the heart of the asylum claim or those that enhance the asylum claim. Here, Ms. Keshishian's purported inconsistencies that the immigration judge relied on, and I don't think the immigration judge was specific enough about what those inconsistencies are, but the ones that the immigration judge did mention, such as the difference between bombs and guns or whether her application or her statement were exactly of the same length and said the exact same thing, those simply do not I.J. focused on two questions. She said the client was insufficiently clear as to her reasons for refusing to work at the factory. She gave grounds having to do with her health, and they also gave grounds having to do with philosophical or political objections she had. And I.J. tried to tease that out of her as to which ground was to be unclear on this point, just couldn't, could not determine the proper ground. Your Honor, shall I address that point first? Yeah, address that. Okay. The immigration judge, first of all, focused on this difference between whether she didn't want to work in the chemical weapons factory on a moral ground or on a health reason. First of all, I don't think that that's a real inconsistency, because Ms. Kashishian testified that she didn't want to work there for both reasons. However, to the extent it is an inconsistency, it doesn't go to the heart of her asylum claim because it doesn't enhance it any. The issue here and what you have to look at to determine whether the adverse credibility finding is supported by substantial evidence on account of the ---- Of course it does. If it turns out she doesn't want to go there for health reasons, that's not a political reason. I mean, they, they, that's a personal reason. And if that is the real reason, if that is the only reason, then that undermines her asylum claim. I disagree with that, Your Honor, for two reasons. First of all, and I was going to get to this later when I talked about asylum eligibility, it is not her decision to not work in the factory that gave her the asylum eligibility on a, being persecuted on account of a political opinion. What gives her the asylum eligibility is the fact that the government, the Hezbollah, imputed a political opinion to her of being, quote, against the government. They repeated this in, in her testimony as having, as saying to her, why are you against the government? If you're against the government, it's going to go very bad for you. It doesn't matter why she didn't want to work in the factory. What's crucial here is that she refused to work in the factory. In other words, in other words, her asylum claim rests on three things, that she was persecuted, on a protected ground, and that it was done by the government. There's no serious dispute that it was done by the government here. So the only dispute is whether the, what happened to her rises to a level of persecution or whether it, or whether it was done on a political ground. I think that the government's testimony, especially in the context, excuse me, Ms. Kashishian's testimony, especially in the context of having been arrested by the Hezbollah and then beaten and imprisoned for two weeks, shows that they had imputed a political opinion to her. And I think that the, what happened to her in the context there of being taken from her home and she refused to show up to work at the factory, being imprisoned, being beaten, being given credible, if, you know, not direct death threats, rises to a level of persecution. And that's why I don't think that these inconsistencies go to the heart of her asylum claim. The problem was that the IJ didn't believe her. I mean, she says this, of course, there's no documentation, there's no backup, which is not saying it's required, but what it makes, what it means is that we have to hinge the entire story on her credibility. There was other ground, I mean, he asked the IJ, she was asked about what kind of weapons they were making. She was quite unclear about that or what she was working on. I mean, to the point, it was really sort of strange credulity that she could have been there and actually worked on these things and not be able to give a better description as to what she was involved in doing. I'm glad you asked that, Your Honor, because it reminds me that I needed to point out another thing that the IJ failed to do, which is account for any reasonable or plausible alternative explanations for any inconsistencies. This Court has required the judges, that immigration judges do that, and this immigration judge didn't do that here. And there's two big things that the immigration judge never accounted for in any respect in her opinion. She never accounted for any translation difficulties. And I'm not saying that translations need to be 100 percent accurate. We're not making a due process claim here. However, there needs to be something in the record on the IJ's opinion saying, I realize that Ms. Kashishian's testimony, for example, might have suffered from any translation difficulties. I think that easily explains the difference between whether bombs or guns or the other. Kennedy, I'm sorry, Your Honor, I didn't hear you. Kennedy, what evidence do we have of that, that there was any problem with the translation? Your Honor, I think it's clear from the face of the testimony. I mean, the questions that were asked, and we cited one instance in our brief where the responses simply, in some cases, are almost unintelligible. Perhaps she was saying those responses unintelligibly in Armenian, and then when it was translated, it was translated precisely correctly. That's a possibility. But the immigration judge has a responsibility to ensure that that's actually the case and to bring that up in the opinion. The immigration judge here never did that. Furthermore, the immigration judge never considered, for example the task was reasonably clear. I mean, you know, if you read transcripts of court proceedings in district court, for example, not everything tracks exactly, but occasionally a word will be, you know, obviously the wrong word. You know, somehow the court reporter just heard the wrong word. So it's not that uncommon, but by and large, I thought the transcript here tracked pretty well. Your Honor. On the other hand, the witness hesitates, you know, doesn't can't come up with a good answer. Sometimes they, whether they're talking English or Armenian, they sound like they don't make much sense. Your Honor, I don't know that I agree that it's reasonably clear, but to the extent you're correct, and it is, what's crucial to focus on is why the immigration judge denied the credibility finding. And the immigration judge here, in somewhat, I think, vague terms, identified immaterial inconsistencies. Well, I had asked you a question about the weapons. Yeah. At some point she said something about working on bombs, and then she talked about pointy things. And I mean, it was the kind of question that I would have thought could have been the case. And somebody who was not there and trying to imagine what these things were that would come up with a kind of explanation, your client did, I can sort of see that. Fair enough, Your Honor. I can see it, too. However, the immigration judge has a responsibility to address why that might not have been the case. Tell me why it might not have been the case. Ms. Kashishian was a chemical engineer and not a weapons manufacturer. She might not have known the difference between what bombs and guns were. She might have been working on parts that were to be sent to another factory. I mean, there's a host of possibilities. And I'm not saying that those possibilities are necessarily true, but I'm saying the immigration judge never considered them and never rejected them. All the -- Counsel, for a highly trained professional, Ms. Kashishian had a surprising lack of detail in what she was working on. Now, even if she was severely compartmentalized, so she couldn't see the whole product from start to finish and wasn't sure what she was working on, really had quite a -- there really wasn't much detail that she could provide as to what she was doing. Your Honor, I'm not sure I can disagree with you from the face of the record. However, she did testify to certain chemicals being used, and I think you can extrapolate from that that they were complex chemicals that are at least beyond my chemical expertise. Well, what were they? I saw it. I read in the record that she described cyan. Is that cyanide? I think that must be cyanide, Your Honor, but I don't know. I'm speculating. And it wasn't clarified. And HNO3, I think they mentioned, too. I believe that's hydrochloric acid, but again, I'm not positive. I'm speculating. That would be HCL, but -- Okay. Then I don't know, Your Honor. There's some form of chemicals, but like I said earlier, I fail to see how they enhance her asylum claim for this to have been the case, and that's what this Court has required for counsel. I'm sorry. It's very simple. I mean, she either was there or wasn't there. You'd expect somebody who was there and doing her job, her profession, to have a pretty clear description of what she was doing. Even if it wasn't in, even if she didn't see the big picture, you'd expect her to give a pretty clear description of what it is that she personally was doing. And it's just not there. Your Honor, it seems like time's elapsed. May I briefly respond? I think that- You're not going to respond only to me, but also to Judge Scanlon. Oh, you're right. Okay. Well, I'll start with your question. I don't know why there isn't more detail here, but it's not our responsibility to figure that out at this point. Our responsibility is to figure out if the immigration judge satisfied the substantial evidence standard. The immigration judge here did not because they did not focus on explaining these things this Court has previously held they need to explain, like alternative explanations, like specificity, like having the inconsistencies go to the heart of the claim. Counsel, I just had a jurisdictional question. We don't have a final order of removal in this case, and typically that is what gives us jurisdiction. Is it your position that the mere granting of cat relief, convention against torture relief, is enough? Your Honor, I did- What's the theoretical basis by which we have jurisdiction? I did not start off with a jurisdictional question, but I think it's clear that there is, in fact, a final order of removal here, and I wish we'd stress this more in our brief in preparing for this argument. Well, I know both sides have agreed that there's jurisdiction, but that doesn't necessarily bind us. We have to satisfy ourselves that we have jurisdiction. Absolutely, Your Honor. However, here there is a final order of removal because, and for the very simple reason, she's removable currently anywhere but Iran. There is an order that's final and she's removable, and that is a final order of removal. Perhaps we didn't say that crisply enough in our brief, and I regret that, but I don't think that there's a sufficient distinction between being granted cat relief and not being granted cat relief for this Court's jurisdictional purposes. One last question. Have you preserved your withholding of removal argument? I do not believe so, Your Honor. Okay. Thank you. Thank you. We'll hear from the government. May it please the Court. Eric Marsteller for the United States. The government has two main arguments in this case. The first is that this Court does have jurisdiction over the petition for review because it is a final order of removal. Secondly, the government believes that the immigration judge's adverse credibility finding is supported by substantial evidence as the record does not compel a contrary conclusion. We'll begin with our jurisdictional argument. Generally, this Court only has jurisdiction to review finals order of removal under 8 U.S.C. Section 1252. We believe that under 8 U.S.C. Section 1101A47, this decision by the immigration judge is a final order. The immigration judge found Miskashishian to be removable, and under 8 U.S.C. 1101A47, a conclusion that an alien is deportable is an order of deportation. Now it would be referred to as an order of removal. Secondly, in Subsection B of that section, it states that an order of deportation is final when it is affirmed by the Board of Immigration Appeals. In this case, the Board affirmed without opinion the decision of the immigration judge, making it a final order of removal. The government concedes that there is some tension with this argument with this Court's decision in Molina Camacho, but the government notes that this precise issue in the Molina Camacho context is being considered by the Court en banc in its Lolong case. One of the questions the Court asked the parties to brief is whether Molina Camacho should be reconsidered en banc on this exact point, and arguments are being held in that case on October 6th. Are you suggesting perhaps we should defer submission in this case until we dispose of Lolong? If the Court believes — if the Court disagrees in — first of all, I think there is some distinction between this case and Molina Camacho. However, if the Court disagrees and believes that this case is controlled by Molina Camacho, then, yes, the case should be deferred until after the en banc court has determined the validity of Molina Camacho. This case is somewhat different because in Molina Camacho what happened was the immigration judge found the alien removable and then granted asylum, I believe. The Board of Appeals denied — reversed the finding of asylum and granted — and then ordered removal. This Court found that the Board doesn't have authority to issue a final order in the first instance. This case is different because the Board affirmed without opinion the IG's decision, so we're only looking at the IG's decision. And for the reasons given in our brief and cited by opposing counsel, we believe this Court does have jurisdiction to consider the petition. Government also believes that the immigration judge's adverse credibility finding is supported by substantial evidence. The immigration judge cited multiple specific instances where the petitioner was unresponsive with the questions material to her claim, including the topics that she was asked during her interrogation. How do we account for translation difficulties that there might be? I mean, it's sort of a vexing problem because other than a translator, I gather there's no one present who knows both languages, or that we can be sure knows both languages. So if the translator really does a bad job, there's no one there to correct them, to check on them. So you've got a situation where the witness is being unresponsive or is giving what appears to be garbled answers. Of course, one inference would be that the witness is being unresponsive because, oh, you know, she's trying to assemble or, you know, doesn't have a good answer to come up with. That's certainly one possibility. But another possibility, or, you know, gives a garbled answer because she's sort of trying to talk her way out of a, you know, a difficult situation. The other answer might be that she's giving a perfectly fine answer, or that the question as translated to her didn't make any sense, or was the wrong question, or that the question came out okay, and her answer came out okay, but that the translator garbled the answer. Well, I think in this case, the immigration judge took steps to remedy that being a problem. The immigration judge asked similar questions repeatedly in different ways, sometimes offering hypotheticals in an attempt to make sure that the petitioner was clear as to what the question was. And under the standard of review in this court, unless the... The immigration court uses certified... Do you know how the translators are certified, or how they get to be translators? I'm not entirely sure. I think most frequently they are contract workers who work for a translation agency of some sort that are hired. Is there a certification requirement? I'm not... I know in this court, to be a translator, one has to be certified in that language, and there's some... I'm not certain. I imagine that there are some requirements in the regulations. I'm not sure exactly what those are. This also raises a question that I posed to Mr. Jarvis about the technical nature of responses from a chemical engineer. I find it hard enough to talk to chemical engineers in English, and if you had to translate technical terms or descriptions, what confidence do we have that the translator understood those answers in Armenian and was able to convey them in English, or would even know how to translate a term that was perfectly understandable in Armenian into its corresponding technical term in English? Well, I think, Your Honor, that there is... There are certain instances in the record where it appears that perhaps the translator with the chemical names, for instance, I believe the translator even said, I don't understand the name of this chemical. So I wouldn't put too much... And I don't think the immigration judge put too much weight in the names of the chemicals that were being used. Right. But wouldn't that be relevant to helping us understand what it was that she was working on? It may, but, Your Honor, the immigration judge's decision wasn't based on what she was working on. It was based primarily on what occurred during her interrogation. It was based on the fact that... The immigration judge actually credited parts of her testimony. He credited the fact that she worked at this weapons factory and that she had been transferred there and that she was detained. The problem was in why she was detained and why she was held and why she was eventually released. During the interrogation, the immigration judge asked multiple questions about the interrogation, asking what questions were asked of her. And she said she was asked about her unwillingness to cooperate in working at the factory. She was also asked, what did you tell them in response to that question? And she told the interrogators that she didn't want to work there because it was harmful to her. He also... The immigration judge asked multiple questions about why the government would believe that she was against the government simply because she didn't want to work in the factory. And the petitioner's responses were unresponsive to the question. She said in response to the first question, what about the weapons they were going to use in the future? Doesn't answer the question. She asked, what about the parts of the weapons that in the future were going to be used to hurt people? She seemed to be avoiding the question, and that was a critical aspect of her case because it was... Her claim is based on imputed political opinion, which means what did the interrogators think her views were? Did they assign her a political opinion that they were then using against her? And on the record of this case, the record just does not compel the conclusion that the interrogators, even assuming she was credible, that the interrogators believed that she was protesting or not working in the factory because of her political opinion. It seems that based on what she told them, that the reason that they would have believed was that she didn't want to deal with the unhealthy effects of working in such a place. Thank you. Thank you, Your Honor. I believe you were... It was over. It was over. Would you like a minute for rebuttal? Yes, Your Honor. And I just briefly want to address the jurisdictional question again. I don't know what this court is going to do in Molina Camacho on Bonk, obviously, but as is... Lolong is the one that's... Sorry? Lolong is the unbanked case. Oh, okay. But it involves Camino Machacho. I'm not familiar with that. I'm not familiar with Lolong. Okay. But as to Molina Camacho, I think that there's a fundamental distinction here that doesn't put this case in any tension with it for jurisdictional purposes, which is that in that case, there was no final order of removal. Here, we posit that there is, in fact, a final order of removal. The grant of the cat claim could be construed as an order of removal. Your Honor, no, I don't think that's technically correct. I think that what the order, the final order of removal here is actually that sheet that the immigration judge checks off, removable, asylum relief denied, and then at the bottom, cat relief granted. Because the cat relief only prevents deportation to Iran, and she's currently removable and deportable anywhere else, I think that does operate as a final order of removal. All right. Thank you. Okay. Thank you. The case will stand submitted. We'll take a short recess for the argument in the next case.
judges: Kozinski, O'scannlain, Bybee